1828, Cignus Telecommunications v. Telesys Communications and others. Mr. Sutton, when you are ready. May it please the Court. There were two errors of fact that had been proposed by the appellees, knowing that they were not the truth, and those were adopted by the Court below. And I believe those two errors need to be corrected on appeal. The first error is at A27, which is the decision below, it's in the back of the blue brief. At A27 lying between 3 and 4 it says, Allman therefore had clearly entered into a contract for the marketing and sale of the alleged invention prior to the critical date. A sale occurs when the parties offer or agree to reach a contract to give and pass rights of property for consideration. Now that's what was adopted from the appellee's proposal, and they knew that it simply wasn't the truth, because the contract in question did not have anything to do with marketing or sale or passing of property rights or anything of that sort. The language came from a declaration filed in the Patent and Trademark Office, not in any litigation, there's no admission in any court by the inventor. It was a declaration that was utterly irrelevant to the outcome, it was not considered by the examiner, it was not adopted, it was not used. But that's really a difficult problem for your appeal, is it not? No, the district court placed a controlling weight on this declaration filed in the Patent and Trademark Office. It wasn't true, however. It wasn't the truth. That's difficult, isn't it, to now, several years later, say that the inventor lied or didn't know what he was doing? He made a mistake. The sentence is on page 826 that led to this error. 826, line 27, the last sentence in that declaration, it says, On October 15, 1990, I entered into a confidential disclosure agreement with Call Interactive. That's the truth. The added words, the only words that are wrong are,  That was a mistake. The contract didn't have anything to do with implementing and marketing the invention. That came later. The agreement was a confidential disclosure agreement. It's typical in business situations when it's a prospective business relationship. If you look at the contract, it's in Volume 2 of the Joint Appendix at A366. The first sentence is, In connection with a prospective business relationship between Call Interactive and Paragon, our discussions will involve information. Parties wanted to be sure there was no public disclosure of the secrets of either side, either Paragon or Call Interactive. They were going to talk about a prospective business relationship, but they didn't want the public to know about what they were going to exchange. Private information about what their equipment was, all that sort of thing. And that was the contract. That contract at A366 never uses the words marketing or implementing the invention or passing of property rights. In fact, to the contrary, it says on page A367, All confidential information shall remain the property of the providing party and not be used by the receiving party in any manner whatsoever. So the contract itself says there was no passage of rights. So the court was mistaken, saying that there was a sale, a passage of rights to Call Interactive from this contract. It simply isn't true. The contract was not for marketing and sale of the invention. The inventor made the mistake in a 1997 declaration, which was long, long prior to any of this litigation. It's a mistake of fact. He said it was marketing and it wasn't marketing. The marketing of the invention took place a year later, after their contract was, after they did engage in this prospective business arrangement. That was after the critical date. So there was no, nothing was done. No sale, no passage of rights of anything sort before the critical date. It was only after the critical date. That's not the only contract. I'm sorry? That's not the only sale that the district court relied on, right? It is the sole sale that the court relied upon. There were half a dozen others that were proposed by the appellees, and the court expressly said that he did not reach any of those. I thought he said that the 386 system was enough. He expressly rejected that, Your Honor. And that's at page A27 again. Footnote 15 says, The court does not reach defendant's argument that Allman's activity in providing services to individuals according to the method and system contained in the patents in suit, using the 386 system, was a public use of the claimed invention. That's public use. That's public use, as opposed to on sale. It's on sale by. He did not reach it as an on sale by. Well, he said he wasn't going to reach public use. Public use and on sale are the same clause of the statute. They're the same clause, but they're different things. No, this is the same one. So when he says public use, he means on sale? He means it was not on sale. He did not reach that question. He says, I did not consider these sales. The 386 was only used with people in foreign countries who were friends and professional colleagues of the inventor, and they had all agreed to keep it in confidence. There was no payment. There was no sale of anything. And all of it was confidential and not a public sale. And the judge expressly says it was not a public use. And it has to be a public. For an on sale bar, it has to be public. Do you ignore the first two paragraphs of that section that you're quoting in the decision? On page 826? The first two paragraphs of the declaration, you mean? No, the offer for sale discussion. Yes. When he talks about whether or not the 386 system was... The 386 was running. ...was on sale. No, he didn't say that. He says it was running in 1990. He charged him for the out-of-pocket cost. This is not a sale. He didn't sell anything to them. He had out-of-pocket expenses for carriers to make a... I understand that you argue that that was experimental use. Yes. And the judge said he didn't reach... He did not reach the question of whether it was an on sale bar. And you say that based entirely on footnote 15. Absolutely. Absolutely. Yes, it was... There was nothing in there about the 386 system, which was used with individuals. And he said it was not... He did not reach that question. So there was no appeal of the decision below that said that that was not applicable. So that's the question before the court. Whether or not it was correct that this was a public use when he says he didn't reach it as a public use. And he thought that it was a sale because of the contract. And the sole reason, the sole ground that he adopted was that this contract was for marketing and sales. And it wasn't for contract. That's true, Mr. Sutton. How come we're spending so much time in this appeal on the question of whether the 386, I would have said sale, 386 transaction, however you want to call it, was experimental or not? Because it was experimental. And the court said it was not a public use. It was experimental. The court did not reach the question of whether that was used. I don't know why we're spending all this time debating 386 because it was a prototype on a nightstand in the spare bedroom of Dr. Allman's apartment in Omaha, Nebraska. It couldn't possibly be used for a commercial offering for sale to thousands of subscribers around the world because it couldn't be done from a nightstand in a professor's apartment. Right, but it's not a claim of the patent that it be offered to 100,000 people all over the world. No, of course not. No, no, no. So as I understand your argument, the claim of the patent to which the 386 system's use was experimental is the claim with regard to DID functioning. Do I not understand that correctly? The 386 was a prototype designed to see whether the DID function would work. That's all it was. It had nothing else to do except to see whether it would work. The 386 was not to see whether or not he could establish a commercial operation in his spare bedroom. That wasn't the purpose at all. It was to see whether you could have a DID number dialed by a subscriber in a foreign country, come into the United States, and get a call back and then call a destination and bridge the two calls to the destination and to the subscriber. They found that the DID would work. So that was a software problem. He hired somebody to do the software. All of that was completed after the critical date, and it was reduced to practice by Colin Durant. When you say the software was completed after the critical date? Yes, yes. I thought Gunther's work was completed in September of 1990. Gunther's work was completed, but there was other software. The contract with Colin Active said that they had to have software. Right. Is there any evidence as to whether their work on the software was not complete before the launch date? Oh, absolutely. What evidence? Absolutely. What evidence? The contract itself. The contract was signed in February, right? The contract was signed in February. There was a non-disclosure agreement back in October, and then a contract in February, right, which said, okay, the launch will be scheduled for April, April 21st or whatever, and it was later put off to the 24th or whatever. Well, 25th. 25th, that's right, because you get the 24th. What evidence is there that the work on the software continued up until the 24th of April? Well, the software was surely done by the 24th. I would think, yeah. But the launch, the software standing alone isn't anything until you launch the service. The service has all these elements of having input from the foreign subscriber and then call back to the foreign subscriber. It's all a package, and that was never accomplished before April 25th. Now, what happened, or what is the state of the evidence with respect to what happened to the, you can call them, they call them customers, you call them beta testers, between June of 1990 and April of 1991? My reading of the evidence is there's just an indication that they continued to have this service available to them throughout that period. Is that true? No, that's not quite true. This was just a way for them to save money. There was one fellow in Switzerland and one fellow in Palestine. No, it was in Jordan. And they were professional colleagues that Dr. Allen had worked with in other matters, and he needed somebody in a foreign country to call in. Not all of their foreign telephone calls were done through this. It was only when they could work it in a time convenient so that they could, with the time changes and that sort of thing, work it out so that they could make occasional calls, and they agreed that they would pay simply the out-of-pocket cost to the carriers, which, of course, was still much cheaper for them because the cost was, the carrier from the United States to the destination was much cheaper than the call. Well, I understand all that, but certainly that doesn't really quite square with the way Paragon was describing the relationship to the persons that were using the service before the service switched over to Call Interactive. They say in their report, one of their reports, the mechanical device was succeeded by a computer-based system, the 386 presumably, which successfully served a small number of core customers. That sounds like they're talking about actually serving customers. Well, that was a service that was confidential in nature. It was not a sale of anything. It was an agreement between these beta testers in the foreign countries that they would use it as best they could, and there were all sorts of failures and problems along the way, which is why— Do we have evidence of that? Yes, of course we do. Where? What? I had a very difficult time trying to sort through the evidence. One of the problems was it wasn't entirely clear what was before the court in the context of the summary judgment, but there are lots of areas where assertions are made, but I couldn't find the evidentiary support. Now, where is the evidentiary support for the fact that there were lots of problems along the way that the beta testers were able to help with? That's the declaration of Allman, and his testimony. His testimony is—yes, that's even better. When you say his testimony, you mean his deposition? His deposition, yes. We have—and I detail that in my brief in great detail. There were constantly problems in that the quality wasn't there. You can't do it from a PC in your spare bedroom. You have to have quality control people 24-7 on a thing, something like this. So it's just all sorts of problems, and he testified about that at great length. It's all in the record. Is it in the appendix? Yes, of course it is. Where would I look? What deposition would I look to to find it? It's the deposition of Allman, and it's— Here's A284 to 303. It's 964. A964 in Volume 3 is the videotaped deposition, and it has time and time again about the problems that they had. And that's the reason that the judge said he wasn't going to reach this issue of whether that was a public use with these users, because it went on at great length about how we had constant problems and quality wasn't there. The page you cite to us is A1007, where Dr. Allman— where you quote him as saying that the 386 embodiment was designed to see if we couldn't use the DID feature. That's correct. But he said— If we look at—I guess this is the question about how— He does say different things in his 1997 131 statement, but if we focus on his deposition— That's wrong. That's mistaken. I understand. You're arguing that it's mistaken. He testified that it was a mistake. I understand. So if we take your premise that Dr. Allman was making this plausible statement that he was testing the DID function with the 386 system, right? Are you with me? And your opponents come back and they say to us, but those people were paying, which Dr. Allman admits they were paying. Doesn't he? No, he does not. They weren't paying for service. They were paying out-of-pocket expenses for carrier costs. Money was passing in. But that's not a sale anymore. But that's the question I'm trying to find out about. So what I would expect from you would be that you would be giving us some evidence that would show that, in fact, there was an agreement with these beta testers and that that agreement was for a limited period of time so that they could test the DID function and that they were aware that that's what they were doing. And that's what I want to know where that is in the record. Okay. The declaration of Allman at 336 is where that appears. Let's get to the right volume. A336? A336, yes, Your Honor. And that's an earlier declaration under Rule 131 from Dr. Allman. And he said that they agreed to keep it confidential. All right. The term beta testers, Judge Bryson, was used in his declaration. That's what I was trying to find. And it's in the 1994 declaration. And it's... The 1994 declaration is at A284. And there is a reference... It's also... Oh, I see. I'm on the wrong one. Okay, 284. Sorry. There's too many volumes here. The reference on A285, which you cite, is Mr. Brenner and Mr. Gandor agreed to keep this experimental testing in confidence. That's right. Is that what you're relying on? That's what I'm referring to. Thank you, Your Honor. I have too many volumes to... Yeah, no, it's a huge record, I agree. And that's what I'm referring to. And he goes on to say that there were problems. He said, as such, the present invention was not yet reduced to practice until it could be demonstrated to function properly. As evidence of this non-functioning and poor functioning, the following additional evidence is entered. And that's page A287 I'm reading. And it had a... Exhibit G says the system was not yet fully operational and still required definition at this late date. Exhibit H says a letter indicating Paragon's attempts to correct failures indicated in Mr. Brenner's beta site operation. So... Exhibit I is a letter from Gail Curtright describing a final functional operation of the hang-up detection circuitry. So this is evidence of the continuing problems... Okay, now, this declaration, was this before the trial court? Oh, yes. In the summary judgment proceedings? Yes. All right, you're representing that that was submitted to the court in connection with the summary... opposition to the summary judgment motion? Yes. Now, Your Honor, you understand that the summary judgment was a very long argument with dozens of issues and dozens of lawyers and lots of issues talked about. Whether we spoke specifically at oral argument about these paragraphs in this declaration, 1994 declaration, I won't represent. But I'm positive that this was part of the record before the district court. Well, part of the record before the district court, what I'm looking for is, was it part of what was submitted in opposition to the summary judgment motion? Because the fact that, I'm sure the record before the district court probably filled the back of a box truck, but the real critical question, at least for me, was this submitted in opposition to the motion for summary judgment? As opposed to simply being attached to a piece of paper filed at some point, sometime before the district court. You can't put the district court on notice of every piece of paper that's sitting in the clerk's office. That's correct. Are you representing that, I thought you were saying that this was before the court in the context of the summary judgment motion and opposition. Yes, just as the 97 declaration was before it. I know that's the case because the 97 declaration contradicts the 94 declaration. The 94 declaration was prepared by a different lawyer who had grown up with these facts, and the 97 was prepared by me, and I was brand new to the case and didn't understand that the first contract was not for marketing and sale of the invention. So mea culpa, that was my error putting that in there, those added words in that sentence. It certainly was a confidential disclosure agreement,  The added words about marketing and implementing the invention were not true because that came with the second contract with Call Interactive, and my unfamiliarity with the circumstances. But I pointed that out to the district court, that the 97 declaration simply wasn't the truth because it contradicted the 94 declaration, which was closer to the event. You want to have contemporaneous statements, and none of this is contemporaneous because 94 is three years after 91, and 97 is another three years later. So errors like this do sneak in. Let's hear from the other side, Mr. Sutton. Yes, Your Honor. I didn't get a chance to discuss my other points. We didn't, but we understand that this is an important one that you need to prevail on if you're to prevail. Mr. Carey. Good morning, and may it please the court. I'm here to address the issue of collateral estoppel and the non-inferior judgments entered on behalf of four individual appellees. Co-counsel Mr. Wood is here to address the issue of the non-self arm. Mr. Mardula is here to address the issue of the claim construction by the directive of the trial attorney. Were you discussing estoppel in connection with the disclaimer of the earlier statement? With respect to the on-sale bar, or as a separate issue? No, Your Honor, separate issue. The collateral estoppel issue that I'm here to argue and was addressed in our brief relates to a blunderton type of collateral estoppel due to another final judgment of invalidity entered in favor of another company that was not appealed. In the same proceeding? In the same proceeding. This was all part of the same proceeding? It was part of the same all-day proceeding. Now, is there any case that you're aware of, nothing that you cited in your brief stood for this proposition. Is there any case that you can point us to that holds that in the context of a multi-party case in a district court, the failure to appeal as to one of the parties creates a collateral estoppel on that very appeal to the benefit of every other party? I believe it's an issue of first impression, Your Honor. Any case going either way? Yeah. It sounds, quite frankly, it sounds very counterintuitive to me. I would be very surprised if we weren't reluctant, at least, to create a rule that would say if you don't appeal with respect to every single party, you lose as to all. And that's really what you're asking us to say, isn't it? Well, the anomaly would be if you don't apply collateral estoppel in this context, the anomaly would be that Heritage, which received a final and disputed, it received a final judgment of invalidity in its favor. The anomaly would be if you don't apply collateral estoppel as to the rest of the appellees, and the court would reverse on validity as to the other appellees, Heritage would have a judgment of invalidity as to it. Which would make Heritage happy and might make Mr. Sutton reluctant that he didn't appeal from Heritage, but doesn't create any injustice with respect to you. Well, it would create an injustice with respect to the other parties, I believe. How about if he didn't sue Heritage in the first place? I mean, that's, Heritage may get a walk for a variety of reasons. He may settle with them on grounds of they pay him 10 cents, and he agrees never to sue them. I mean, the problem is the collateral estoppel is there to try to make sure that somebody doesn't get multiple sequential bites at the apple. This is the Cygnus' first bite at the apple in the Court of Appeals. And they've had only one bite at the apple in the District Court. And I don't see the policy underlying collateral estoppel applicable at all in this setting. And it just doesn't seem to be a fit at all for the kinds of policies that collateral estoppel is designed to promote. Well, Your Honor, respectfully, I would suggest the following. The anomaly would be that you'd have, if Mr. Sutton were to prevail on this appeal, on all issues, potentially the other appellees would not be able to perform their services. Heritage, however, not even a part of this appeal, would not have any risk of being enjoined. Which would happen if he had settled with them. But he didn't settle. No, but he could have settled with them. Suppose he had settled with them when it appeared highly likely that he was going to lose in the summary judgment proceeding. And just settled and got them out of the case. If he had settled with them, that would have been, I think, a totally separate issue. So your position is that despite their bankruptcy, despite their apparent inability to pay any judgment, despite their lack of a lawyer, that nonetheless he was obliged to take an appeal against them? Your Honor, yes, he was obliged to take an appeal against them if he wanted to seek a reversal of the holding of invalidity against that company. As against them? That's not your problem. But if he fails to undo that final judgment of invalidity, under blonder terms than this Court's other precedent in applying it in the Dana Court case, then he should be stopped from asserting validity against other parties. Except that you would agree, I think you disagreed with me, that blonder tongue doesn't really answer this question. It's not forceful of the facts, Your Honor. I think this is a unique factual situation. But its language refers to previous adjudications, and its policy concerns, as Judge Bryson has pointed out, is to avoid repeated litigation. So clearly, there's no policy reason in line with the Supreme Court's decision for us to apply it here. I respectfully disagree, Your Honor, for the following reason. This Court in Dana Court said that the timing of the other decision was irrelevant, that the issue of priority is not important under Dana Court. It clearly said that that wasn't an important issue, and it addressed on appeal for the first time a collateral estoppel issue. Now, Mr. Carey, you're into your colleague's time. You can use it, if you like, on this issue. But you've used up the five minutes you asked for. I'll just make two quick points, Your Honor, and then I'll yield to my colleagues. One is, it's not a harsh result to apply collateral estoppel here, because Cygnus chose to sue a multitude of companies simultaneously. And therefore, it is not harsh to require Cygnus to keep track of the cases that it files and the separate judgments that are entered in them. And it's not harsh to take a useless appeal, you're saying, when there's no one left on the other side. Well, that heritage corporation was never dissolved. It sold its assets. Hypothetically, it could restart, it could become recapitalized and begin business, and it would have a judgment out there holding the patent invalid, and I believe it would be anomalous for there to be one holding of invalidity and other holdings of not invalidity. I'll yield the rest of my time to Mr. Wood. Okay. You've used up three more, so Mr. Wood, you have two minutes left. Good morning, Your Honor. I didn't hear the question. You had Mr. Carey asked for five minutes and used eight. You asked for five minutes, of which he has used three. Yes. Your Honor, the last issue is the DID issue, and I don't think that will take long. Let me address the on-sale bar issue. In response to Judge Bryson's question about what is the record before the district court, we included that in the appendix. I apologize it was so long, but I think it was necessary. It's at A1978 through A2000. The 1994 declaration is not part of that record. Now, let's make sure I understand exactly what you're saying. Are you saying the 1994 declaration is not any part of the record on appeal before the district court? It was never entered before the district court in any way, manner, or fashion, or, that's A, or B, that it was not entered in connection with the filing of the summary judgment motion and the opposition? The statement that I'm making is right now, B, that it was not part of the record before the district court when it considered the 102 on-sale issue. And Mr. Sutton says, ah, but it was. And can you point me now to exactly where I would go to find out which of you is correct? Yes, the entirety of the papers that were filed by Cygnus in opposition to the 102 motion are filed at A1978 through A2000. And I'm going to modify that just a little bit. Actually, it's A2005. That includes the brief. What volume is that in? This would be in volume 5. All right. Go ahead. And what was included in that opposition was a declaration of Mr. Allen that was objected to  Which declaration? The declaration of October 31st of 2007 was filed in connection with the opposition to the motion for summary judgment. Substantial portions of that declaration were stricken by the district judge as part of footnotes 14-825 of the record. This was his decision. On various evidentiary grounds. In fact, the only partial portions of that declaration that was even relied upon That declaration being which declaration again? This is the declaration that was filed Let me give you the conviction page. A1978. That declaration being the 2006 declaration. Correct. Quickly, you say this is all that was filed. Were there any exhibits attached to this declaration? The exhibits are attached. The exhibits consist of Just these four or five pages? 19-2000. These nine pages. Those were the exhibits. Before the district court, that's all there was by way of opposition to summary judgment. Mr. Sutton appears to disagree. But that's it. This is important because that's what the judge had to consider when he was looking at summary judgment. It is important. I think it's important because there are many other things in this so-called record that were frankly not cited in connection with the particular motion at issue or were cited for a completely different purpose or were not cited at all. I can go through the list. The 1994 declaration was certainly not cited at all in connection with the motion for summary judgment on sale bar. I don't want to waive the objection to that, but one of the exhibits that was cited in connection with this 1994 deposition was A299. No, the 1994 deposition. No, you don't mean deposition. Declaration. The 1994 declaration was page A299, which is a press release, which I find to be remarkable because it says Paragon, and this is a press release dated January 10, 1991, which was before the critical date, and it says Paragon Services International has developed and implemented a new system to supply discounted international voice telephony services. It goes on to say that the system, and the last paragraph, the system has been in beta testing since October 1990 and is now fully operational, and this occurred before the critical date. Now, again, I don't want to waive our objection to that entire 1994 declaration because it was not before the district court, but the fact of the matter is that there was substantial commercial exploitation of this invention going back to June of 1990, almost 10 months. One of the things that the Supreme Court was concerned about in the FAF case when they established the separate criteria of ready for patenting was not just was there an offer for sale. Someone with an idea can seek customers or investment or infusion and still not have satisfied the requirements for ready for patenting, and we know despite, I know you make much of it in your briefs, that reduction of practice when something is reduced to practice is ready for patenting. I think that there is enough to show that that isn't necessarily always the case, but one of the things that I didn't see a full response to was this ready for patenting. The district court relied on the statement to the patent office as to how everything had been reduced to practice. Is that what you're relying on also? We rely on that as well, but I think we rely upon much more for the reduction of practice. If you look at the declaration of Mr. Alleman, excuse me, the deposition of Mr. Alleman taken in 2006, we meticulously went through over about 40 pages of deposition transcript, each element of each claim, and we asked whether that element was found in the 386 system, and in each instance, every element was found. That's reduction of practice. What does that have to do with ready for patenting? We know there can be experimental use after reduction to practice. I know that you've taken a contrary position, but there are cases on both sides of that. Well, the experimental use exception is something that is on the burden of the person confronting, in other words, Cygnus in this case, on the person confronting evidence. Are you relying on the burden of proof, or are you relying on evidence? No, I'm relying upon evidence. We have come forward with a lot of evidence in this case to show that there were sales, multiple sales. The recent case of Atlantic Attachment made the comment that where you have sales or offers for sale in mass, and in that case, I believe there were 40 units that were being offered for sale. Here, we have evidence... If it's ready for patenting. We have those two criteria that are critical. Well, that's right, but if it's ready for patenting, ready for patenting, and then actual reduction to practice is an element of ready for patenting, as I understand it, which means if you have actual reduction to practice, which we clearly have here, then you do have ready for patenting. I think that there's substantial case law that we've suggested... Is that what you're relying on, the actual reduction to practice? Correct. But let me go to something else on the experimental use. It is Cygnus' burden to come forward with evidence to show that, and in order to show that, they must show that the experimental use has something to do with one of the claimed elements in the patent. But if that's a disputed fact, then they were entitled to present evidence and not to have an adverse summary judgment. Well, except that that's not a disputed fact, because the only thing that they put forward was scalability. Scalability is not a part of the claims. Scalability is not an element of the claims. So scalability as a matter of law could not, no matter how much testing they did to determine scalability, could not have been a basis for experimental use. But Allen also said he was testing the DID function. Well, except that there's no evidence for that. Other than his statement. Other than his statement. And that's a mere scintilla. Is that your position? Well, I don't think his statement is enough to raise a triable issue of fact under Rule 56. I look back at the evidence that was presented to the court. It would be fair and reasonable if he's going to rely on other evidence than it be presented to the district court so the district court could respond to it. And frankly, so that all of the appellees, AT&T and TELUS and CEL, could respond to it as well. We were never given that opportunity, but we responded to it. Let me make sure that I understand your answer to Judge Polk's question, which seems to me a good one. Are you saying that the statement by the inventor that he was engaged in testing a particular feature of the invention is not enough to create a triable issue of fact? I think that we have argued that. You have argued it. We think that that is not enough. And why is that not enough? The reason is because an inventor faced with his own prior declaration... Set aside the prior declaration. Suppose all we have on the record, you say the burden is on him to come forward with evidence of experimental use, and he comes forward, setting aside everything else in the case, he comes forward and says, I was experimenting, and here's what I was experimenting to determine, and that's a feature of the claim. Why isn't that enough to create a triable issue? That may be enough to create it, but I don't think that's the facts that we have in this case. Okay, and why is this different? The reason that it's different is because in this case, Mr. Alleman had gone through all of his testimony regarding what he was trying to accomplish, and it boils down to scalability. It boils down to commercial scalability. Well, how about the DID? Pardon? How about the DID function? Yeah, but the DID function, you see, and we'll go back to your hypothetical, if that was what he was testing, and it was clear that he was testing that someplace along the line, then he may be right, but that's not in the record. There's no evidence that we can find. There's nothing that was before the court on summary judgment with respect to the DID testing issue, you say? That's what I'm saying. That's what I'm saying. I don't have any recollection. What was before the court is what I've identified to Your Honor earlier, which was the declaration of Alleman, and I don't believe that that has anything in it regarding the DID. You don't believe or you don't know? Pardon? You're saying you don't believe, you're saying that we need to hunt it up and see if it's there? Well, if you'd give me a couple of minutes, I'd look through the declaration, but I don't recall anything in that declaration, and that's the only thing that was before the court related to DID testing. Let me interrupt. What is the third issue that Mr. Mardula was to discuss? You asked for five minutes. This is the meaning of DID, and that's an issue that doesn't, well, it's a claim construction issue. To discuss it? You're to discuss the meaning of DID, which is a claim construction issue, but you're saying DID is not before us in reviewing these claims with respect to DID? Not as an element of what was being experimented with, alleged by Mr. Alleman. The use of DID and what that means is a separate issue from DID as used to experiment and see if the system would work. Have there any more questions for Mr. Wood at the moment? All right. Mr. Mardula, we are already well over time, so to the extent that we need to know what you're about to tell us, please be speedy. Mr. Wood was talking about his Volume 5 of the joint appendix in the AT&T case. We've invaded the time for the second. Yes, never mind. We'll see that everyone has enough time to discuss the issue, so that's why I couldn't find it. My suggestion is that I have an opportunity for my case in chief to talk about DID numbers before Mr. Mardula addresses it, but that's... Well, thank you, Mr. Sutton. I was about to remark that since the issue hasn't been raised on the appeal, is this something that you need to cover? It has been raised on the appeal. Mr. Sutton did raise the issue of whether or not the DID claim term is properly construed by the district court. Well, in the briefs. In the briefs, but it wasn't argued. He didn't argue today, yes. No, he did not. I'm willing to rely on the briefs, so I argue. In fact, that's about the best argument I've made in a long time. Thank you, Mr. Mardula. Now, Mr. Sutton, you have a few moments of rebuttal in this case, let's say three we've run well over, and then we'll proceed with the next case and fill the gaps. All right, then I won't... But I think concentrate on the on-sale issues. I think concentrate, it seems to me, on any rebuttal on the on-sale issue because that was the one on which the court decided against you. I will do so, but I respectfully request that we have some of the times of the AT&T case on this because Mr. Wood was referring to AT&T evidence, not the consolidated appeal. But I will address that, and I'd like to address page 1980 in the AT&T volume 5 that Mr. Wood referred to. He said that this was stricken, at least parts of it were stricken by the district court, but that doesn't mean that it wasn't before the court. So Judge Bryson, when you say was it before the court, it certainly was before the court, but the judge didn't adopt it. Well, when you say some of this, are we talking about... First of all, let me make sure that we're in... This is hopeless. We're not going to be in agreement, I can predict. But let me just ask. Is it true that all that you submitted to the district court... Well, don't start to say no before I get to the end of the question because you may agree with me. All that you submitted to the district court in connection with the summary judgment was the material between A1978 and A2000. And if that's not true, what else did you submit? In connection with the summary judgment motion. Because your opposing counsel says that's it. Well, it is true. Okay, what else is there? There was the deposition, the declarations... Submitted in connection with the summary judgment motion? Yes, of course. It was all before... Where would I find out how to resolve... This is an important question, and so far we have dramatically different positions taken by counsel as to what was before the court. We had the declarations of 1994 and the 1997 declarations were before the court. The court ruled on that. This declaration here from Dr. Ullman, which is referred to as A1978, was dated October 31st, 2007. That's not under 20th. Sorry? 1978. You're looking at the AT&T appendix? AT&T's Joint Appendix, Volume 5. He says that 1978 to 1987 was all there was, plus the newspaper article and the like. That simply isn't the truth. I do want to address page 1980 in response to... You say it's simply not the truth. Short of taking your word for it, where would we find the items that were before the court in connection with the summary judgment submission that you made to the court? Well, you're not allowed to include on appeal the briefs to the parties and that sort of thing. We don't have an exact replica of the record before the district court. I can assure you we had these declarations and the depositions and that sort of thing before the court. Maybe we just have to ask the parties to submit exactly what was submitted. We can order the record from the district court. It's going to take a while. Yes, we were discussing the best way to resolve this. It does seem as if we're going to have to look at the record. Is it appropriate for us to ask you to send us what was filed on both sides in connection with the summary judgment record? We can also order the record, of course, but it takes sometimes quite a while. I'm sure I have it. If you can both consult to make sure that you aren't going to squabble about what's submitted, but send us what was filed before the district court. I would like to address A1980 on Judge Rison's quote. I know it was you, Judge Newman. You said something about DID. Paragraph 8 on 1980 of the Joint Appendix of AT&T says, in early 1990, I conceived the idea of using blocks of DID numbers to give each subscriber a unique signal to send to the service to request a callback because the signal can be detected without answering, and so on. Now, that answers the question about was DID before the district court because it's in paragraph 8. That wasn't a precise question. The question was, was it before the district court that the 386 system was to test the DID functionality? That's on the next page. That's on the next page. It said, paragraph 9, quoting from the brief that was filed by the appellees, it said, the technique using a dedicated line was available as of late 1980s is not true. It was simply not the case. And he was able to point out that he had done it before the 386 system, but that was never any commercial availability of that invention in the 1980s. So that was a failed experiment. And then if we go further on down, the paragraph 12, it says on page 1981, the statement that Paragon actually implemented this dedicated line system and by 1990 had several customers using it is false. Gandor, who is the man in Jordan, and Brenner, who is the man in Switzerland, were not customers. They were testers to see whether the black boxes would work. They were colleagues that agreed to test the device to see whether it would work in the intended manner. There was no arm's length commercial transaction, simply a test. That was before the district court. That refers to the black boxes. Is there anything that refers to the 386 system? Yes, yes. It goes on. Yes, yes. It's 14 on 1982, says the statement. The 386 system is a claim that the invention of both patents and suit is false. The 386 system had the functionality of a personal computer with dialogic cards embedded in it. However, while it was designed to see if we could use the DID feature, it was not scalable. It could be used for two testers, but it would not scale for commercial use, as I testified at the Wood Exhibit 1, page 140, which is referring to his deposition. The 386 system was not claimed, both patents. It was not claimed. Now, Wood Exhibit. This is an inference that Mr. Wood asked you to draw. You can infer that it was in the claims of the patents, but it wasn't true. The inferences can't be drawn in favor of the non-moving party, in favor of the moving party. Wood Exhibit 140 is an exhibit that was filed with the court in connection with the defendant's summary judgment motion, I take it? Yes. Here, you're referencing there. It may have been in a rebuttal, but it was in the deposition. Well, it probably wouldn't have been in a rebuttal, because the rebuttal was filed after yours. No, this was after all briefing, I think. Oh, this was later? This was a rebuttal to the brief filed by AT&T on this point. So this was a rebuttal? This was before the argument, you see. You were asking about what was before the court at the argument of the summary judgment. This was a declaration that was put in in response to what had been argued by AT&T. Well, if you say this was in response to a reply by AT&T. No, an opposition. An opposition. No, I'm sorry. You're right. Yeah, I'm sorry. I missed one. OK, in which case, you must have filed something earlier. I did, yes. And I will provide all of that to the court. So this isn't the only thing that you filed. Of course not. Of course not. Well, you say of course not, but they say that it was. I'm really at sea on this. And somebody is either confused. I certainly am. Or somebody's not shooting straight on this. I will have the entire record. And I will confer with Mr. Wood about that. All right. OK. All right, so that takes care of appeal number 13-2.